| | | |
|---|---|---|
| MICHAEL ANGELO GADDY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| HAROLD REEP, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon initial review of Michael Angelo Gaddy's pro

se Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Also

before the Court are Petitioner's Request for Admissions (Doc. No. 3), Motion to Appoint

Counsel (Doc. No. 4), Motion for Leave to Conduct Discovery (Doc. No. 5), Motion for

Discovery/Production of Electronically Stored Information (Doc. No. 8), and Motion for Funds

to Hire an Expert (Doc. No. 10).

I.      BACKGROUND

Petitioner is a prisoner of the State of North Carolina, who, on August 20, 2012, was

indicted by a Mecklenburg County grand jury for trafficking by possession of more than four but

less than fourteen grams of heroin, possession with intent to sell or deliver a controlled

substance, maintaining a dwelling for keeping controlled substances, and possession of drug

paraphernalia. State v. Gaddy, 768 S.E.2d 64, 2014 WL 7149731 at *1 (N.C. Ct. App. 2014)

(unpublished). Prior to trial, Petitioner filed a motion to suppress all evidence, which was

denied. See id. On June 26, 2013, Petitioner entered an Alford plea to all charges and reserved

1

his right to appeal the denial of his motion to suppress.  See id.  The trial court consolidated the charges for judgment and sentenced defendant to 70–93 months imprisonment.  See id.

On direct appeal, Petitioner argued that the trial court erred in sentencing him to 70–93 months for his Class F drug trafficking conviction when the mandatory sentence for his date of offense was 70–84 months.  See id.  The North Carolina Court of Appeals agreed, reversed Petitioner's sentence, and remanded the matter for resentencing.  See id.

On January 7, 2015, Petitioner was resentenced to 70-84 months imprisonment.  (Order Regarding Mot. for Appropriate Relief, Pet. 29 ¶10, Doc. No. 1.)  Petitioner did not file a direct appeal after resentencing.

On or about April 15, 2015, Petitioner filed a Motion for Appropriate Relief ("MAR") in the Mecklenburg County Superior Court, challenging the judgment entered upon his Alford plea.  (State's Resp. to Cert. Pet., North Carolina v. Gaddy, No. P15-881, 2015 WL 8185244 at *2 (N.C. Ct. App. filed Dec. 2, 2015).)  On September 14, 2015, the state court denied Petitioner's MAR on procedural grounds and on the merits.  (Order Regarding MAR, Pet., supra at 29 ¶¶14-20.)

Petitioner filed a Petition for Writ of Certiorari in the North Carolina Court of Appeals, seeking review of the state court's order denying his MAR; the petition was denied on December 4, 2015.  (Order Den. Cert. Pet., Pet. 31, Doc. No. 1.)  Petitioner filed his federal habeas Petition on January 11, 2016, when he signed and placed it in the prison mailbox.  (Pet., supra, at 24.)

## II.  STANDARD OF REVIEW

### A.  Rule 4

The Court is guided by Rule 4 of the Rules Governing Section 2254 Cases, which directs district courts to examine habeas petitions promptly.  Rule 4, 28 U.S.C.A. foll. § 2254.  When it plainly appears from any such petition and any attached exhibits that the petitioner is not entitled to relief, the reviewing court must dismiss the motion.  Id.

### B.  The Antiterrorism and Effective Death Penalty Act of 1996

Review of Petitioner's claims that were adjudicated on their merits by the state courts is limited by the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), as construed by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 374-91 (2000).  This Court may grant habeas relief on claims of constitutional error adjudicated on their merits in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A state court decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by th[e United States Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]."  Williams, 529 U.S. at 405; Lewis v. Wheeler, 609 F.3d 291, 300 (4th Cir. 2010) (quoting Williams, 529 U.S. at 405).  A state court unreasonably applies federal law when it "identifies the correct governing legal rule from th[e

Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case."
Williams, 529 U.S. at 407.).  A state court's determination that a claim fails on its merits cannot be overturned by a federal habeas court "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

When the state court does not provide reasons for its denial or dismissal of a petitioner's claim, the federal habeas court must "determine what arguments or theories . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court."  Richter, 562 U.S. at 102.  A petitioner has the burden of establishing that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 103.

## III.    DISCUSSION

### A.  Ground One:  Fourth Amendment Violation

In Ground One, Petitioner claims that officers illegally searched his hotel room without a warrant and without his consent and that evidence seized during the search was introduced at his trial in violation of the Fourth Amendment.  Petitioner raised this claim in his MAR.  (Pet. 9, Doc. No. 1.)  The state court held that it was procedurally barred pursuant to N.C. General Statute § 15A-1419(a)(3) and without merit.  (Order Regarding Mot. for Appropriate Relief, Pet. 29 ¶¶14-21, Doc. No. 1.)

In Stone v. Powell, the Supreme Court held that "where the State has provided an

opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 481–82 (1976). Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim at his pre-trial suppression hearing and on direct appeal in the state courts. Thus, he is not entitled to habeas review of his Fourth Amendment claim. This claim is dismissed.

### B. Grounds Two, Four, and Five: Due Process

In Grounds Two, Four, and Five, Petitioner claims that the officers involved in his case engaged in a conspiracy to "hoodwink" the judicial system by falsifying their official "narratives"[1] to cover up that they did not have consent to search Petitioner's hotel room, thereby violating his right to due process. (Pet., <u>supra</u>, at 13, 18, 19-20.) Petitioner raised these allegations in his MAR. (Order Regarding Mot. for Appropriate Relief, <u>supra</u>, at 29 ¶13.) The state court found the allegations to be without merit. (Order Regarding Mot. for Appropriate Relief, <u>supra</u>, at 29-30 ¶¶15-20.)

"A conviction after a plea of guilty normally rests on the defendant's own admission in open court that he committed the acts with which he is charged." <u>McMann v. Richardson</u>, 397 U.S. 759, 766 (1970) (citing <u>Brady v. United States</u>, 397 U.S. 742, 748 (1970)). A guilty plea "is also a waiver of trial . . . and unless the applicable law otherwise provides, a waiver of the right to contest the admissibility of any evidence the State might have offered against the defendant." <u>Richardson</u>, 397 U.S. at 766 (footnote omitted). Therefore, the Constitution requires that a

_____

[1] The official "narratives" are the officers' individual reports based on their own roles in a particular operation. (Exs. 2 & 3, Pet. 37-39, Doc. No. 1)

5

defendant entering a guilty plea must do so knowingly, voluntarily, and intelligently. See Brady, 397 U.S. 742 at 748. A defendant enters a guilty plea intelligently when he is "advised by competent counsel, . . . made aware of the nature of the charge against him, and there was nothing to indicate that he was incompetent or otherwise not in control of his mental faculties." Id. at 756. A guilty plea is voluntary if "entered by one fully aware of the direct consequences" of the plea. Id. at 755 (citation and quotation omitted).

"When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Tollett v. Henderson, 411 U.S. 258, 267 (1973). "He may only attack the voluntary and intelligent character of the guilty plea." Id.

In this case, Petitioner entered a plea pursuant to North Carolina v. Alford, 400 U.S. 25 (1970). An Alford plea is "an arrangement in which a defendant maintains his innocence but pleads guilty for reasons of self-interest." United States v. King, 673 F.3d 274, 281 (4th Cir. 2012) (citations and internal quotation marks omitted). A trial court may accept an Alford plea when: "(1) the defendant 'intelligently concludes that his interests require entry of a guilty plea;' and (2) 'the record before the judge contains strong evidence of actual guilt.'" Id. (quoting United States v. Mastrapa, 509 F.3d 652, 659 (4th Cir. 2007)). In contrast to a guilty plea, a defendant entering an Alford plea, "does not confirm the factual basis underlying his plea." King, 673 F.3d at 281 (citing United States v. Alston, 611 F.3d 219 (4th Cir. 2010)). "The trial court's evaluation and ultimate acceptance of an Alford plea ensures 'that a defendant's protestations of innocence do not undermine confidence that the constitutional requirement that a

plea of guilty be voluntary and intelligent has been satisfied.'" <u>King</u>, 673 F.3d at 281 (quoting

<u>United States v. Taylor</u>, 659 F.3d 339, 347 (4th Cir. 2011)).

Here, Petitioner does not assert that he entered his <u>Alford</u> plea based upon the

incompetent advice of counsel. <u>Cf.</u> <u>Tollett</u>, 411 U.S. at 267 (holding that after a criminal

defendant pleads guilty on the advice of counsel, he may only attack the voluntary and intelligent

character of the guilty plea by showing that counsel rendered ineffective assistance relative to the

plea). Nor does Petitioner assert that the trial court erred in accepting his <u>Alford</u> plea. "In

entering his plea to the charges [Petitioner] admitted his guilt, averred that he made the plea

knowingly and voluntarily, and admitted that he fully understood the plea agreement and that he

accepted the arrangement." (Order Regarding Mot. for Appropriate Relief, <u>supra</u>, at 29 ¶16.)

"In his Transcript of Plea and in open court the defendant, under oath, said that he was satisfied

with the services of his attorney, that he and his attorney had discussed possible defenses, if any,

to the charges, that there was a factual basis for the entry of the plea and that even though he

entered an <u>Alford</u> plea he understood that he would be treated as if he was in fact guilty." (Order

Regarding Mot. for Appropriate Relief, <u>supra</u>, at 29 ¶17.)

In short, Petitioner does not attack the voluntary or intelligent character of his <u>Alford</u>

plea. All of the errors Petitioner complains of relate to alleged deprivations of constitutional

rights that occurred prior to entrance of the <u>Alford</u> plea. Furthermore, Petitioner has made no

effort to link those alleged constitutional deprivations to the voluntary or intelligent nature of his

<u>Alford</u> plea. Consequently, he has waived the allegations of error raised in the instant Petition.

<u>See</u> <u>Blackledge v. Perry</u>, 417 U.S. 21, 29-30 (1974) ("[W]hen a criminal defendant enters a

guilty plea, he may not thereafter raise independent claims relating to the deprivation of

constitutional rights that occurred prior to the entry of the guilty plea. Rather, a person complaining of such antecedent constitutional violations is limited . . . to attacks on the voluntary and intelligent nature of the guilty plea, through proof that the advice received from counsel was not within the range of competence demanded of attorneys in criminal cases.") (internal quotation marks and citations omitted)). Therefore, these claims are dismissed.

### C. Ground Three: Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective for failing to present evidence at the suppression hearing that would have contradicted the officers' version of events surrounding the search.[2] Petitioner also claims that appellate counsel was ineffective for failing to challenge the trial court's denial of the motion to suppress on direct appeal. Petitioner raised these claims in his MAR (Pet., supra, at 14-16), and the state court denied the claims on their merits (Order Regarding Mot. for Appropriate Relief, Pet., supra, at 30).

In Strickland v. Washington, the Supreme Court identified two necessary components of an ineffective assistance claim. 466 U.S. 668, 687 (1984). First, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, "the defendant must show that the deficient performance prejudiced the defense." Id.

---

[2] The Court could dismiss Petitioner's ineffective assistance of trial claim for the reasons explained in Section B: Grounds Two, Four, and Five. See, discussion, supra, at 5-8. However, because the Court dismisses this Petition on initial review pursuant to Rule 4, and Petitioner's Alford plea was conditioned upon his right to challenge his motion to suppress on direct review, the Court, out of an abundance of caution, will review Petitioner's ineffective assistance of trial counsel claim on their merits.

When assessing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689. To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. For a claim involving a motion to suppress, the petitioner is required to show that, but for counsel's unprofessional errors, "the motion . . . likely would have been granted, and . . . [there is] a reasonable probability that granting the motion would have affected the outcome of his trial." Grueninger v. Dir., Virginia Dept. of Corrections, 813 F.3d 517, 525 (4th Cir. 2016) (citing Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); Tice v. Johnson, 647 F.3d 87, 104, 107-08 (4th Cir. 2011)).

"[W]hen a petitioner's habeas corpus claim is based on alleged ineffective assistance of counsel . . . . [t]he AEDPA standard and the Strickland standard are dual and overlapping, and [the court] appl[ies] the two standards simultaneously rather than sequentially." Lee v. Clarke, 781 F.3d 114, 123 (4th Cir. 2015), as amended (Apr. 15, 2015) (quoting Richardson v. Branker, 668 F.3d 128, 139 (4th Cir. 2012)) (internal quotation marks omitted). Because both standards of review are "'highly deferential' to the state court's adjudication . . . , 'when the two apply in tandem, the review is doubly so.'" Id. (quoting Richardson, 688 F.3d at 139).

i.      **Trial Counsel**

The Fourth and Fourteenth Amendments guarantee the rights of individuals to be free from unreasonable searches by the government. "[S]earches and seizures inside a home without

a warrant are presumptively unreasonable." Kentucky v. King, 563 U.S. 452, 131 (2011) (internal citation and quotation marks omitted). Likewise, "travelers are entitled to be free from unreasonable government scrutiny in their hotel and motel rooms." United States v. Gray, 491 F.3d 138, 144 (4th Cir. 2007). However, "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" King, 563 U.S. at 131 (internal citation and quotation marks omitted). For example, "a police officer may search a home without a warrant if . . . 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" Hunsberger v. Wood, 570 F.3d 546, 553 (4th Cir. 2009) (quoting Mincey v. Arizona, 437 U.S. 385, 394 (1978)). "[V]alid consent to seize and search items [also] provides an exception to the usual warrant requirement." United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007) (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973)).

The trial court heard evidence on Petitioner's motion to suppress for two days. (Def.-Appellant's Br., State v. Gaddy, 2014 WL 2709362, supra, at *4.) The record shows that Officers Riggan and Sprague of the Charlotte Mecklenburg Police Department ("CMPD") made contact with Petitioner by means of a "knock and talk" at his hotel room. Petitioner testified on his own behalf and presented testimony from another witness. (Def.-Appellant's Br., supra.) Petitioner's state appellate brief summarized his testimony at the suppression hearing as follows:

> Mr. Gaddy testified that he initially told officers to go away when they knocked on his door. When he then opened the door, the officers saw a syringe cap on the floor. The officers then bolted into the room, without his consent. The officers searched his room thoroughly, opening drawers and going through his cubbyhole. After the officers searched his room, they asked him for his consent to search his room both on a video recording in an officer's car and by signing a consent form. Mr. Gaddy believed that he had not given consent on the video and did not know the form he signed at the police station gave the officers his permission to search his room. (T

pp 9, 10, 13-21; 25-28, 32, 37-41)

The State presented testimony from several police officers, who presented the following

evidence:

> Mr. Gaddy gave two officers [Riggan and Sprague] verbal consent to search his
> room for weapons or any other people who might be in the room. During this
> sweep, one officer found drug paraphernalia on the bathroom floor. The officer
> detained Mr. Gaddy until a third officer [Grosse] arrived. That third officer
> obtained Mr. Gaddy's consent to search the room on a police video recorder. The
> officers then searched Mr. Gaddy's room thoroughly, finding heroin and
> paraphernalia. This officer had Mr. Gaddy sign a form showing his consent later
> at the police station. (T pp 133-147, 171-185)

(Def.-Appellant's Br., supra, at *4-*5.)

Based upon the testimony presented, the trial court orally denied the motion to suppress,

and later filed an amended written order denying the motion. (Am. Order Den. Def't's Mot. to

Suppress, State v. Gaddy, No. 14-360 (N.C. Ct. App. filed May 12, 2014).)[3] The trial court

found as matters of fact that a detective with the CMPD was conducting investigative

surveillance of Room 213 of the Budget Inn, on Independence Blvd. in Charlotte, North

Carolina, where persons suspected of retail theft were believed to be staying; during the course

of that surveillance, the detective observed a woman with money in her hand approach Room

212, knock, and then leave when no one answered; shortly thereafter Petitioner and William

Whitlow drove up and entered Room 212; the detective suspected that the occupants of Room

212 might be connected to the occupants of Room 213, and that there might be ongoing illegal

drug activity in Room 212; Officers Riggan and Sprague responded and conducted a "knock and

---

[3] The Record on Appeal was amended to include the trial court's order. (Order Regarding MAR, Pet. 29 ¶10, Doc.
No. 1.) The trial court's order can be found attached to the Defendant Appellant's Second Unopposed Motion to
Amend the Printed Record on Appeal, State v. Gaddy, No. 14-360 (N.C. Ct. App. filed May 12, 2014), available at
https://www.ncappellatecourts.org (follow NC Appellate Courts Electronic Filing Site link).

talk" at Room 212; it took six minutes for the officers to obtain a response; when Petitioner opened the door, he appeared to be very nervous; he was sweating, with his neck vein visibly pulsing; with the door open, both officers observed a syringe on the floor near the bed and nightstand; the officers asked Petitioner and Whitlow to step outside the room, checked their identification, and requested permission to enter the room to search for weapons and other people; Petitioner verbally consented to entry by the officers; Riggan and Sprague took steps to protect their safety[4] by calling for assistance from a third officer, handcuffing Petitioner and Whitlow before entering the room, and conducting a cursory search for weapons and other people; no weapons or other people were found, but officers observed a torn grocery bag on the bathroom floor; during this search, officers did not "open drawers, lift mattresses, or otherwise conduct a thorough search for evidence;" when the third officer, Grosse, arrived, he took over the investigation; Grosse asked Petitioner to accompany him to the parking lot of the Budget Inn, obtained video equipment from a fourth officer's car, and recorded a brief interview with Petitioner; Grosse requested permission to enter Room 212, and Petitioner voluntarily consented; Officers Grosse, Riggan, and Sprague conducted a search of Room 212 in the presence of Petitioner; Petitioner acknowledged ownership of a jacket and duffel bag and consented to a search of these belongings; officers located a syringe on the floor near the bed, seven other syringes, torn plastic and waxed-paper bags with some residue appearing to be black tar heroin

---

[4] Petitioner makes much of the fact that the trial court found "[t]here were at least five police suspects in Room 212 in addition to Defendant Gaddy and Mr. Whitlow." (Am. Order Den. Def't's Mot. to Suppress, supra, at ¶16.) Petitioner contends that the trial court deliberately found that the five other suspects were in Room 212, rather than Room 213, in order to justify denying the motion to suppress. On the contrary, the finding was made to explain why Riggan and Sprague took steps to protect their safety. (Am. Order Den. Def't's Mot. to Suppress, supra, at ¶17.) Furthermore, the trial court's prior findings of fact regarding the suspected relationship between Rooms 212 and 213 and its subsequent finding that a cursory search for weapons and other persons in Room 212 revealed neither (Am. Order Den. Def't's Mot. to Suppress, supra, at ¶18) make it reasonable to conclude that the trial court listed the wrong room unintentionally.

and drug paraphernalia. (Am. Order Den. Def't's Mot. to Suppress, <u>supra</u>.) The court concluded as a matter of law that the evidence seized was not obtained in violation of the United States Constitution. (Am. Order Den. Def't's Mot. to Suppress, <u>supra</u>.)

According to Petitioner, trial counsel was in possession of evidence that would have contradicted the officers' testimony at the hearing and corroborated his own. Specifically, petitioner points to his personal telephone records (Pet'r's Ex. 4, Pet. 40, Doc. No. 1) that he contends show he was on the telephone at the time Officers Riggan and Sprague claimed to have initiated contact with him. According to Riggan's and Sprague's official case narratives, they initiated the "knock and talk" at Room 212 at "approximately [2:00 p.m.]" on August 9, 2012. (Pet'r's Exs. 2 & 3, Pet., <u>supra</u>, at 37-39.) Petitioner's phone records for August 9, 2012, show that five outbound calls were made on Petitioner's phone between 2:08 and 2:28 p.m. (Pet'r's Ex. 4, Pet., <u>supra</u>, at 40.) He argues that he could not have been talking on the phone while interacting with Riggan and Sprague.

It would not have been unreasonable for the state court to conclude there was no reasonable probability that introduction of Petitioner's telephone records would have changed the outcome of the suppression hearing. <u>See</u> <u>Grueninger</u>, 813 F.3d at 525. Riggan's and Sprague's notation of the time at which they initiated the "knock and talk" was an approximation, not an exact time. (Pet'r's Exs. 2 & 3, Pet., <u>supra</u>, at 37-39.) In other words, it could have been after 2:00 p.m. when the officers began knocking on the door of Room 212. Moreover, the trial court found as a matter of fact that it took around six minutes for Petitioner to open the door once the officers began knocking. Thus, the state court reasonably could have concluded that the purported discrepancy between Petitioner's phone records and the time cited

in the officers' narratives was not evidence of dishonesty on the officers' parts.

Next, Petitioner cites a report an investigator made of an interview with Whitlow (Pet'r's Exs. 6 & 7, Pet., _supra_, at 42-43.)  Prior to trial, counsel hired an investigator to locate and interview Whitlow.  (Pet'r's Ex. F, Pet., _supra_, at 49.)  The investigator provided counsel a report summarizing Whitlow's statement.  (Exs. 6 & 7, Pet., _supra_, at 42-43.)  According to the report, Whitlow and Petitioner left the hotel to get something to eat.  At some point after they returned, Whitlow left Room 212, saw two officers walking toward him, became nervous, overreacted, and returned quickly to the room.  He told Petitioner the officers were coming.  (Pet'r's Ex. 6, Pet., _supra_, at 42.)  According to Whitlow,

> shortly afterwards there was a knock at the door and when Gaddy opened the door there were two Officers.  Whitlow stated he was sitting on the bed and the Officers asked Gaddy several questions such as "is there anyone else in the room and do you have any weapons."  Whitlow stated at no time did Gaddy give the Officers consent to search his room.  And he doesn't recall the Officer's even asking.  Whitlow recalls one of the Officers looking at the floor and seeing an "orange cap to a syringe" and then heard one of the Officers say "probable cause".  Whitlow added at this point the Officers came into the room and asked both Gaddy and him to step outside.  Whitlow stated at this point both him and Gaddy were handcuffed for one hour while the room was searched and a third Officer became involved.

(Pet'r's Ex. 6, Pet., _supra_.)  Whitlow also stated that the officers told him they were dealing with robbery suspects in the next room when they saw Whitlow turn quickly and go back to Room 212.  (Pet'r's Ex. 6, Pet., _supra_.)

The Court notes that Petitioner does not claim that trial counsel was ineffective for failing to call Whitlow himself to testify at the suppression hearing.[5]  Instead, he contends that counsel

---

[5] It is possible, even probable, that Whitlow was the other witness who testified for the defense at the suppression hearing (Def.-Appellant's Br., 2014 WL 2709362, _supra_, at *4).  If that was the case, either Whitlow did not testify consistently with his statement, or, if he did, the trial court did not find him any more credible than it did Petitioner.

should have brought the investigative report "to light" at the hearing.  (Pet., supra, at 15.)

Assuming that Whitlow's statement to the investigator was admissible, cf. State v. Ingram, 774

S.E.2d 433, 440 (N.C. Ct. App. 2015) ("[T]he rules of evidence do not apply in suppression

hearings."), it would not have been unreasonable for the state court to conclude there was no

reasonable probability that admission of the statement would have changed the outcome of the

suppression hearing.  See Grueninger, 813 F.3d at 525.

      As an initial matter, it would not have been unreasonable for the state court to question

the credibility of Whitlow's statement to the investigator.  According to Whitlow, before

entering, the officers asked Petitioner whether there were any weapons or other people in the

room, which indicates the officers were concerned about their personal safety.  Yet, also

according to Whitlow, as soon as they saw what they considered to be "probable cause" to enter,

the officers came into the room, thereby indicating a lack of concern about their personal safety.

Upon entering the room, the officers once again indicated concern for their personal safety by

asking Petitioner and Whitlow to step out of the room and hand-cuffing them, before proceeding

back into the room to conduct a search.  The trial court's findings of fact indicate that Officer

Sprague had at least ten years of law enforcement experience and had made 50 to 100 drug-

related arrests in the area where the Budget Inn was located.  (Am. Order Den. Def't's Mot. to

Suppress, supra, at ¶ 5.)  Sprague's narrative, which was before the state court as part of

Petitioner's MAR, states that he was aware that weapons and drugs are often found together.

(Pet'r's Ex. 3, Pet. 38, Doc. No. 1.)  It would not have been unreasonable for the state court to

conclude that a veteran officer conducting a "knock and talk" in an area he knew to involve high

drug activity would not have entered a hotel room where evidence of illegal drug activity was in

plain view, without first securing the room's occupants for his and his partner's safety.

Furthermore, while Whitlow states that "at no time did [Petitioner] give the Officers consent to search his room," Whitlow was not with Petitioner and Officer Grosse when Grosse conducted the video-taped interview with Petitioner. Moreover, both Riggan and Sprague's narratives indicate that Sprague questioned Petitioner once he and Whitlow stepped outside the room. (Pet'r's Exs. 2 & 3, Pet., supra, at 37-38.) There is nothing in the record to indicate that Whitlow was involved in that conversation or even close enough to hear it. Thus, Whitlow's statement corroborates Petitioner's testimony that he did not give consent to search only to the extent that Whitlow was in a position to overhear Petitioner's conversations with the officers.

Regardless, even assuming Whitlow's statement that Sprague and Riggan entered the room without consent is trustworthy, officers may legally make a warrantless entry without consent where they "(1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant." United States v. Cephas, 254 F.3d 488, 494-95 (4th Cir. 2001) (citing United States v. Turner, 650 F.2d 526, 528 (4th Cir.1981)). The state court reasonably could have concluded that the following facts known to Riggan and Sprague constituted probable cause for them to believe there was evidence of ongoing illegal activity in Room 212: 1) the occupants of Room 213 of the Budget Inn were robbery suspects and were under surveillance by CMPD officers; 2) during the course of the surveillance, a detective observed a woman with money in her hand approach Room 212, knock, and then leave when no one answered; 3) shortly thereafter Petitioner and William Whitlow drove up and entered Room 212; 4) the detective suspected that the occupants of Room 212 might be connected to the occupants of Room 213; 5) he also suspected there

might be drug activity in Room 212; 6) the Budget Inn was located in an area of high drug activity; 7) Officer Sprague had made 50-100 drug-related arrests in that area over the previous ten years; 8) Whitlow left Room 212, saw Sprague and Riggan approaching, turned around quickly, and reentered Room 212; 9) it took at least six minutes for Petitioner to open the door of Room 212 after the officers knocked; 10) when Petitioner opened the door, he appeared to be very nervous; he was sweating and his neck vein was visibly pumping; 11) both officers observed a syringe on the floor of the room near the bed and nightstand[6] (Am. Order Den. Def't's Mot. to Suppress, supra, at ¶¶ 4-13); and based upon his training and experience, Riggan knew that syringes are used to introduce heroin into the body (Pet'r's Ex. 2, supra, at 37).

Additionally, it would not have been unreasonable for the state court to conclude that, based upon the totality of circumstances, Riggan and Sprague reasonably could have believed evidence might be destroyed or removed before they could obtain a warrant. See Cephas, 254 F.3d at 494-95. For example, Whitlow saw the officers and returned to Room 212, where Petitioner was, before the officers reached the room; it took at least six minutes for Petitioner to open the door after the officers began knocking; drugs and certain drug paraphernalia, such as syringes, can easily be hidden in a person's clothes or belongings; Petitioner and Whitlow had a vehicle at the hotel; and short of being detained, nothing prevented Petitioner and Whitlow from leaving the hotel with evidence concealed on their persons or in their belongings. Thus, even

---

[6] Whitlow's statement corroborates Petitioner's that there was a syringe cap on the floor near the bed that was visible to officers from the open doorway. It would not have been unreasonable, however, for the state court to conclude that the presence of a syringe cap on the floor near the bed did not make the officers' testimony that they saw a syringe on the floor near the bed any less credible. In fact, the trial court found that among the items recovered from Room 212 was a syringe found on the floor near the bed. (Am. Order Den. Def't's Mot. to Suppress, supra, at ¶ 25.)

taking Petitioner at his word that he did not give Riggan and Sprague permission to enter his room, it nevertheless would have been reasonable for the state court to conclude that the officers' initial entry did not violate the Fourth Amendment.  See Cephas, 254 F.3d at 494-95.

If the state court concluded Riggan and Sprague lawfully entered Petitioner's room, it would not have been unreasonable for the court to also conclude that they did not need a warrant, or Petitioner's permission, to conduct a protective sweep of Room 212.  "A 'protective sweep' is a quick and limited search of premises, . . . conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  Maryland v. Buie, 494 U.S. 325, 327 (1990).  A protective sweep is justified if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene."  Id. at 334.  Although Buie was a case in which police legally entered the home to serve an arrest warrant, "[t]he vast majority of circuit courts to have considered the issue have upheld protective sweeps conducted in non-arrest situations in which officers are lawfully on a defendant's property."  United States v. Portis, 407 F. App'x 669, 671-72 (4th Cir. 2011) (unpublished) (citing United States v. Miller, 430 F.3d 93, 98 (2d Cir. 2005) (finding "that a law enforcement officer present in a home under lawful process . . . may conduct a protective sweep when the officer possesses" articulable facts as outlined in Buie ); (United States v. Gould, 364 F.3d 578, 584 (5th Cir. 2004) (en banc) ("[A]rrest is not always, or per se, an indispensable element of an in-home protective sweep."); State v. Davila, 203 N.J. 97, 999 A.2d 1116, 1127–29 (2010) (collecting cases)).

The trial court found that one of the detectives monitoring Room 213 informed Riggan

and Sprague that the occupants of Rooms 212 and 213 might be connected and that he suspected drug activity in Room 212; Whitlow observed Riggan and Sprague approaching, turned around, and entered Room 212; it took at least six minutes for Petitioner to open the door; there was drug paraphernalia in plain view; and Riggan and Sprague knew there were at least five suspects in Room 213, plus at least two people in Room 212.  (Am. Order Den. Def't's Mot. to Suppress, <u>supra</u>.)  One of the inferences the trial court made was that Riggan and Sprague were outnumbered.  (Am. Order Den. Def't's Mot. to Suppress, <u>supra</u>, ¶17.)  Additionally, as noted previously, Sprague knew that weapons and drugs are often found together.  (Pet'r's Ex. 3, Pet., <u>supra</u>, at 38.)  Rational inferences that could have been drawn from this set of facts were that, in the more than six minutes that elapsed between Whitlow returning to the room and Petitioner opening the door, anyone else in the room could have hidden, with or without a weapon; the room's occupants could have alerted their suspected confederates next door that police were present; and weapons could have been placed out of sight but still remained within easy reach.  Although not overwhelming, these facts and the rational inferences drawn from them could lead a reasonable state court to conclude that "a reasonably prudent officer" would be warranted "in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene."  <u>See</u> <u>Buie</u>, 494 U.S. at 334.  Notably, there is evidence in the record that Riggan and Sprague were concerned about their safety.  They asked whether there were any weapons or other people in the room; had Petitioner and Whitlow to step out of the room; frisked Petitioner for weapons, with his consent; and hand-cuffed Petitioner and Whitlow before entering the room to search it.  They secured Petitioner and Whitlow in the room while they made a cursory search for anyone else who might be hiding there.  After observing what appeared to be drugs and drug paraphernalia in plain view on the bathroom floor, they waited in the room with Petitioner and

Whitlow, still hand-cuffed, for Officer Grosse to arrive. (Am. Order Den. Def't's Mot. to Suppress; Pet'r's Exs. 2 & 3, Pet., <u>supra</u>, at 37-39.)

As for whether Petitioner provided consent to Officer Grosse for the CMPD to search his room for evidence, the state court reasonably could have concluded that Whitlow's statement did not corroborate Petitioner's testimony that officers searched his room for evidence before seeking consent. Whitlow's statement that "at this point both him and Gaddy were handcuffed for one hour while the room was searched and a third Officer became involved," is ambiguous. It does not indicate whether Whitlow considered Riggan's and Sprague's protective sweep a distinct search, part of the search for evidence, or not worth mentioning at all. Nor does it indicate at what point Grosse arrived – before, during, or after the search for evidence. Moreover, it sheds no light on how Grosse was involved. In short, the state court could have reasonably concluded that Whitlow's statement does not call into question the trial court's finding that Grosse obtained Petitioner's consent to search Room 212 for evidence prior to that search taking place.

As noted, to succeed on a claim that trial counsel was ineffective in the way he handled a motion to suppress, the petitioner is required to show that, but for counsel's unprofessional errors, "the motion . . . likely would have been granted, and . . . [there is] a reasonable probability that granting the motion would have affected the outcome of his trial." <u>Grueninger</u>, 813 F.3d at 525 (citations omitted). Here, fairminded jurists could disagree that a determination by the state court that there was no reasonable probability the suppression motion would have been granted had Petitioner's phone records and Whitlow's statement been admitted into evidence, would be inconsistent with clearly established Fourth Amendment law, as decided by

the Supreme Court, or the holding in <u>Strickland</u>.  <u>See</u> <u>Richter</u>, 562 U.S. at 102.  As such, Petitioner's ineffective assistance of trial counsel claim must be dismissed.

### ii. Appellate Counsel

In the context of a claim of ineffective assistance of appellate counsel, the "proceeding" at issue is the forum in which the petitioner's appeal was heard, which in this case, was the North Carolina Court of Appeals.  <u>See</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 285–86 (2000) (holding, in the context of an ineffective assistance of appellate counsel claim, that the "prejudice" element of the <u>Strickland</u> standard is satisfied by a showing of a reasonable probability defendant would have prevailed on appeal but for appellate counsel's deficient performance).  Under <u>Strickland</u>'s "prejudice" prong, as applied simultaneously with AEDPA's deferential standard of review, Petitioner must demonstrate that the state court unreasonably concluded that he failed to demonstrate there was a "reasonable probability" the North Carolina Court of Appeals would have held in his favor had counsel challenged the denial of his motion to suppress on direct appeal.  <u>See</u> <u>Richardson v. Branker</u>, 668 F.3d 128, 140 (4th Cir. 2012).

On direct appeal, the scope of review of a suppression order is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."  <u>State v. Cooke</u>, 291 S.E.2d 618, 619 (N.C. 1982) (citations omitted).  "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding."  <u>State v. Chukwu</u>, 749 S.E.2d 910, 916 (N.C. Ct. App. 2013) (citation omitted).  If there is competent evidence to support the trial court's finding, then it is binding on appeal, "even if the evidence is conflicting."  <u>State v. Barden</u>, 572

S.E.2d 108, 120–21 (N.C. 2002) (citation omitted).

Here, the only finding of fact Petitioner identifies as being unsupported by competent evidence is "[t]here were at least five police suspects in Room 212 in addition to Defendant Gaddy and Mr. Whitlow." (Pet., <u>supra</u>, at 15) (citing Am. Order Den. Def't's Mot. to Suppress, <u>supra</u>, ¶16). As previously explained, however, it would have been reasonable for the state court to conclude that the trial court simply wrote the wrong room number by mistake. <u>See</u> discussion, <u>supra</u>, at 11 n.3.

Petitioner's other challenges are to factual findings that conflicted with his testimony at the suppression hearing. For example, on the issue of consent, it is evident that the trial court found the officers' testimony, summarized in Petitioner's brief on appeal (Def.-Appellant's Br., <u>supra</u>, at *4-*5), more credible than Petitioner's. "Weighing the credibility of witnesses and resolving conflicts in their testimony is precisely the role of the superior court in ruling on a motion to suppress." <u>State v. Veazey</u>, 689 S.E.2d 530, 533 (N.C. Ct. App. 2009) (citation omitted). The fact that the testimony conflicted does not mean there was no competent evidence to support a finding of fact, one way or the other.

The state court reasonably could have concluded that Petitioner failed to identify any finding of fact that was not supported by competent evidence. In such a case, the trial court's findings of fact are binding on appeal, <u>see</u> <u>Cooke</u>, 291 S.E.2d at 619, and it would not have been unreasonable for the state court to conclude there was no reasonable probability of success had counsel challenged denial of the motion to suppress on appeal, <u>see</u> <u>Strickland</u>, 466 U.S. at 694; <u>Richter</u>, 562 U.S. at 102. As such, Petitioner's ineffective assistance of appellate counsel claim must be dismissed.

**IT IS, THEREFORE, ORDERED** that:

1) Petitioner's Petition for Writ of Habeas Corpus (Doc. No. 1) is **DISMISSED** pursuant to Rule 4 of the Rules Governing Section 2254 Cases;

2) Petitioner's Request for Admissions (Doc. No. 3), Motion to Appoint Counsel (Doc. No. 4), Motion for Leave to Conduct Discovery (Doc. No. 5), Motion for Discovery/Production of Electronically Stored Information (Doc. No. 8), and Motion for Funds to Hire an Expert (Doc. No. 10) are **DISMISSED** as moot; and

3) Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

Signed: August 19, 2016

Frank D. Whitney
Chief United States District Judge

23